Commonwealth of Pennsylvania *v.* Egan, Appellant.

Argued April 9, 1934. Before TREX-
LER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD,
PARKER and JAMES, JJ.

*Benjamin C. Sigal,* for appellant.

*John F. Haggerty,* Assistant District Attorney, and with him *Andrew T. Park,* District Attorney, for appellee.

OPINION BY STADTFELD, J., July 13, 1934:

The appellant, James Egan, was indicted with six others, on counts of riot and inciting to riot. The indictment was tried in the court of quarter sessions of the peace of Allegheny County at April Sessions, 1933, together with two other indictments which charged John Kallis, (one of the co-defendants with James Egan, appellant), with aggravated assault and battery. The cases were tried on May 8, 1933, before HILDEBRAND, P. J., 53rd Judicial District, specially presiding, and a jury.

A motion was made at the opening of the trial for a severance of the trial of the riot indictment from the trial of the assault and battery indictments, which motion was overruled.

The indictment against James Egan and six others contained two counts, the first with inciting to riot, and the second with riot. The first count (the one on which appellant was convicted) charged that the de-

fendant and six others, on the fourth day of March, 1933, etc., ...... "with intent then and there to disturb the peace of the said Commonwealth, and devising and intending to create riots, unlawfully, wickedly and maliciously did then and there incite encourage and endeavor to provoke and instigate divers citizens of the said Commonwealth whose names are to this inquest unknown, to unlawfully, riotously and routously assemble and gather together to the number of ten and upwards, to disturb the peace of the Commonwealth and to injure and annoy citizens thereof, and to create terror among the good citizens of this Commonwealth, to the evil example of all others in like case offending, contrary" etc.

The testimony on behalf of the Commonwealth was to the effect that on March 1, 1933, a group of persons representing an organization known as the "Unemployed Council" had applied for a permit to hold a meeting in front of the court house in the City of Pittsburgh, on March 4, 1933, and were refused. Application was then made to hold this meeting in front of the City-County Building which is immediately adjacent to the court house, and this was refused, but a permit was issued for the Schenley Park Oval. On that date, twenty or more policemen were detailed to the neighborhood around the court house. From different sections of the city crowds of men designating themselves members of the "Unemployed Council" were marching in the direction of the City-County Building. Most of these crowds had been stopped by the police some distance away from the building and were made to disperse. Between 2:00 and 2:30 P. M. a large crowd had gathered near the City-County Building and the court house, variously estimated as consisting of 200 to upwards of 5,000 people. About 2:25 P. M. two officers who were riding through the

crowd on horseback were struck by persons in the crowd. It was testified to that the officers had been assigned for the purpose of preventing a demonstration, for which application had been made and refused, and for which hand bills had nevertheless been distributed, advertising the said proposed meeting. Some of the officers described the crowd as milling about, disorderly and interfering with traffic and the officers; that there was considerable congestion on the sidewalk and they endeavored to keep the crowd moving and met with some resistance by the crowd. During this period a man in the crowd was raised to the shoulders of other men, at the corner of 5th Avenue and Grant Street, in front of a drugstore opposite the court house, and then as one of the mounted officers moved in from where he was, to prevent the speaking or demonstration, there was interference with his advancement by some of the crowd by taking hold of the reins of the horse. Several arrests were made at the time. Some of the crowd were trying to take a prisoner away from the officers; that at about 2:40 P. M., when comparative quiet had been restored, James Egan, the appellant, got up on one of the stone pillars in front of the court house to make a speech; that he began with the words "Come on, comrades, let's fight, this is the time to fight" or words similar thereto; before proceeding any further he was pulled down from the pillar by two of the officers and arrested; at this the crowd booed. There was testimony that appellant, in a speech at a meeting held the previous night at West Park, Pittsburgh, said, "We are going to have a meeting in front of the City-County Building; we have been refused a permit, but we are going to have it anyhow, even if it causes bloodshed."

On behalf of the defendant there was testimony that the crowd came together to discuss the proposed ces-

sation of relief payments, and to petition the authorities against the same; that as the crowd gathered around the court house the police charged into it with swinging clubs, and that there was no noise or excitement prior to this charge of the police. It was denied that the defendant Egan used the language testified to on behalf of the Commonwealth, when he was on the pillar, and it was testified to by Egan and witnesses on his behalf, that the words he used at this time were ''Comrades and fellow workers, we have a right to freedom of speech''; he denied that he said anything to encourage a disturbance or had any intention to do so. Six other persons were arrested at the same time for causing the alleged disturbance. It was also denied by him, and witnesses on his behalf, that he used the language attributed to him as having been used in his speech at West Park.

At the conclusion of the evidence, the defendant, appellant, presented a request for binding instructions which was refused. The court submitted the case to the jury in a charge defining the terms ''riot'' and ''inciting to riot,'' in accordance with the well recognized and often quoted and approved definition as set forth in Commonwealth v. Merrick, 65 Pa. Superior Ct. 482. The jury found appellant guilty of inciting to riot and found all the other defendants not guilty on all charges. Motions for a new trial and arrest of judgment were refused, and the appellant was thereupon sentenced to pay costs of prosecution and undergo an imprisonment of one year in the Allegheny County jail. From that judgment and sentence the present appeal is taken.

There are eight assignments of error, but the argument on behalf of appellant is presented on three phases only: (1), that the evidence produced by the Commonwealth on the charge of inciting to riot was

insufficient to warrant the court in submitting the case to the jury; (2), that the evidence was insufficient to warrant the jury in finding the defendant guilty of inciting to riot; and (3), that the court abused its discretion in consolidating the indictments. The first two branches of appellant's argument may be considered together.

In the language of our late President Judge ORLADY, in the case of Commonwealth v. Merrick, supra, on p. 489: "While incitation to riot is not a statutory offense in this State, it was clearly an offense at common law, and has been always so recognized in Pennsylvania. The gist of that offense is, its tending to provoke a breach of the peace, even though the parties may have assembled in the first instance, for an innocent purpose. ...... giving the word 'incite' its plain and accepted meaning—to arouse, stir up, urge, provoke, encourage, spur on, goad,—there can be no doubt of the offense charged in the first count, without which offense there would be but few developed riots." And on p. 491 the following language from the charge of the lower court was approved: "Inciting to riot, from the very sense of the language used, means such a course of conduct, by the use of words, signs or language, or any other means by which one can be urged on to action, as would naturally lead, or urge other men to engage in or enter upon conduct which, if completed, would make a riot. If any men or set of men should combine and arrange to so agitate the community to such a pitch, that the natural, and to be expected results of such agitation, would be a riot, that would be inciting to riot, an offense at the common law, an offense charged in the first count in this indictment."

Appellant contends that the trial judge erred in that portion of his charge wherein he used the follow-

ing language: "With reference to the speech of James Egan; Egan denies having used the words which the officers attribute to him and said that he merely made some reference to the right of freedom of speech and Button tells you that he heard him say something of the kind. Other witnesses testified that they heard something of a similar nature, that Egan introduced his speech by saying, 'We have a right of freedom of speech, a right of speech.' Those witnesses corroborate Egan as to what he said. The language is quite different from that which the police say he used. Egan said that he got up on the pillar. It seems that he knew that a permit had been refused, the request had been refused but he testified he felt he was acting within his rights. He said he had no intention to incite his hearers. If he said what the officers said he did, it would avail him little to say that he did not intend to incite anybody, because the natural effect of words of that kind would be to stir up his hearers to opposition to the police. It is for you to determine whether or not the language used, under the circumstances, was such as to incite his hearers, if it was such to incite them to riot, then as to Egan's own testimony as to his words, if that was what you find to have been the effect of what he said, you would be warranted in finding him guilty of inciting to riot."

Quoting from the language of our Brother KELLER in Com. v. Spartaco, 104 Pa. Superior Ct. 1, on p. 5: "As was said by Judge GIBSON, when presiding at nisi prius in the case of Com. v. Hains, 4 Clark 17, where the defendant was charged with the same offense, 'No man has a right to trifle with the feelings of any large class of men, so as to provoke them to a breach of the peace.' But that case supports the principle that the words uttered or the acts done must be proved to have been such as to support a finding that

they were said or done, as the case may be, with intent to provoke a riot or with a reckless and wilful disregard of their probable outcome in that respect.''

The language used by appellant, whether it be that as testified to by witnesses for the Commonwealth or that as claimed by appellant and his witnesses, must be considered in the light of all the facts and circumstances as established by the evidence. Was it such as would tend to a breach of the peace and likely to provoke or incite a riot?

The places for which applications had been made are at or near the intersection of two of the most prominent thoroughfares in the downtown section of the City of Pittsburgh. Street car lines are routed over each of said streets, and there is a heavy stream of automobile traffic on both streets at all hours of the day, as well as a large amount of pedestrian travel. Applications for permits to hold a meeting or demonstration in front of the court house and at the City-County Building had been refused. This refusal was known to appellant. Notwithstanding, circulars had been distributed the day previous announcing the holding of this meeting at the time and place for which applications had been refused. The police had before the meeting dispersed bands of people moving in the direction of the two public buildings above mentioned. A crowd variously estimated from 200 to upwards of 5,000 had gathered in the immediate vicinity. Traffic had been interfered with and it was difficult to keep the crowd moving. Prior to the attempt of appellant to make a speech, arrests had been made, some of the police officers had been assaulted and an attempt made to rescue one of the prisoners. Another party had tried to make a speech which had resulted in some disorder and arrests. When appellant was taken down from the pillar, there was booing by the crowd.

In a very comprehensive opinion by Mr. Justice SIMPSON, our Supreme Court has held in the case of Duquesne City v. Fincke, 269 Pa. 112, that neither the 14th Amendment to the Federal Constitution nor sections 7 and 20 of the Bill of Rights of the State Constitution, vest in the citizens a constitutional right to hold public meetings upon the streets of a municipality. It is not necessary to quote at length from that opinion where the subject is fully discussed. It however quotes from Davis v. Massachusetts, 167 U. S. 43, as follows: "...... The 14th Amendment to the Constitution of the United States does not destroy the power of the states to enact police regulations as to the subjects within their control ...... and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the Constitution and laws of the State, and for this reason decided the requirement of a permit was only a reasonable regulation by the city. To the same effect are Wilson v. Eureka City, 173 U. S. 32; and State ex rel. Lieberman v. Van de Carr, 199 U. S. 552." Rights of free speech and assembly must be exercised in subordination to reasonable rules and regulations adopted by proper municipal authorities, in regard to use of public streets and buildings. It follows that defendant and those associated with him had no right upon any ground, to hold a meeting in the streets without a permit. What they attempted was a breach of the law and in defiance of the lawfully constituted authorities.

On the day in question the atmosphere in the city was tense on account of the general proclamation closing the banks throughout the country. There was discontent generally prevailing on account of unemployment and cessation of relief payments. No object,

no matter how laudable and worthy, is ever accomplished by resort to violence or opposition to lawfully constituted authorities. Many well intentioned persons are misguided by over-zealous leaders who, through use of intemperate language, tend to lead to a breach of the peace and violation of the law. In a government by the people the important thing is their self-control if our institutions are to endure. While the sympathy of every one is with the unemployed, particularly in the period of depression through which the world at large has been passing, it has been to the credit of our country that its citizens have faced the situation calmly and philosophically, and with a united effort to work ourselves out of our distress. These efforts however must be in consonance to and respect for the law, and not in opposition to it.

There was a material dispute as to the language said to have been used by appellant. The controlling questions were ones of fact, and all of these facts were submitted to the jury in a fair and adequate charge by the trial judge. The verdicts showed a careful discrimination by the jury. We have made a careful examination of the entire record and believe that the defendant had a fair and impartial trial.

The foregoing disposes of the first and second propositions advanced by appellant. There remains only the other question as to the consolidation of the indictments. While technically appellant may have been entitled to a severance because there was a separate indictment on the charge of riot and inciting to riot against appellant and his associates, and separate indictments against John Kallis for assault and battery, yet in view of the fact that Kallis was acquitted on the separate indictments against him, and that the latter was a co-defendant in the indictment on which Egan was tried, and that the alleged assault

and battery arose out of and in connection with the same unlawful assembly out of which arose the indictment against appellant, evidence in relation to the assault and battery would have been admissible against appellant if the jury had been sworn only as to the indictment against appellant. We can not see that appellant was, under the circumstances, prejudiced by the consolidation of the indictments, or that it was such substantial error as would warrant a reversal on that ground.

The assignments of error are overruled and judgment of the lower court affirmed, and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence, or any part of it, which had not been performed at the time the appeal in this case was made a supersedeas.